**NOT FOR PUBLICATION**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

- - - - - - - - - - - - - - - - - - - - - - - - - -X

In re:

                     Chapter 7 Proceeding

LAWRENCE S. AND JANET B. COVEN,    Case No. 04-24703 (RTL)

       Debtors.
- - - - - - - - - - - - - - - - - - - - - - - - - -X

DANIEL E. STRAFFI, TRUSTEE

                     Adv. Pro. No. 04-2845

       Plaintiff,

    v.

LAWRENCE S. COVEN,

       Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - X

**OPINION**

**APPEARANCES:**

**Daniel E. Straffi, Esq.**
Attorney for Plaintiff, Daniel E. Straffi, Chapter 7 Trustee

**Barry W. Frost, Esq.**
Teich Groh
Attorneys for Debtor/Defendant

**RAYMOND T. LYONS, U.S.B.J.**

    In this adversary proceeding, the Trustee, Daniel E. Straffi, objects to the discharge of Lawrence

S. Coven, Debtor, under 11 U.S.C. §§727(a)(2), (a)(3), (a)(4), and (a)(5).  The court holds the Plaintiff

has proven his case by a preponderance of the evidence with regard to Code sections 727(a)(2) and

(a)(5).  Judgment is entered in favor of the Trustee.  Debtor's discharge is denied.

## JURISDICTION

This court has jurisdiction  under 28 U.S.C. § 1334(b), 28 U.S.C. § 157(a) and the Standing

Order of Reference by the United States District Court for the District of New Jersey dated July 23, 1984,

referring all proceedings arising under Title 11 of the United States Code to the bankruptcy court.  This is

a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(J) to determine objections to discharge.

## FINDINGS OF FACT

Lawrence S. Coven (the "Debtor") filed a voluntary petition under chapter 7 of the Bankruptcy

Code along with his wife, Janet B. Coven, on April 29, 2004.  Daniel Straffi is the trustee in the Coven

case.  Mr. Coven was an attorney at law in New Jersey, but consented to a disbarment on April 2, 2002.

Lawrence Coven started his own law practice in the mid 1990's and achieved some financial

success specializing in plaintiffs' personal injury litigation.  In 1997, he purchased a large 5,300 square foot

residence in Warren Township, Somerset County, New Jersey, among the most prosperous counties in

the country.

Besides practicing law, Lawrence invested in real estate.  His mother, Maria Coven, was a real

estate agent, as well.  Other than their residence, Lawrence and Janet Coven purchased a two family house

at 492 Central Avenue, New Providence, NJ from Lawrence's parents.  They also invested in another

residence/office for rental at 1330 Howe Lane, North Brunswick, NJ, and four office condominiums on

Route 22 in Greenbrook, NJ, where Lawrence maintained his law office.  Lawrence also invested in a

2

commercial building at 7 Cedar Grove Lane, Somerset, NJ.  This last investment appears to have been the cause of the Covens' financial ruin and Lawrence's disbarment.  The cash needs of CSLTPC, Inc., and unfulfilled expectations for financing, set off a chain reaction resulting in the Covens' downfall.  The court will recount these transactions in chronological order.

## Somerset Property

Lawrence Coven formed a corporation, CSLTPC, Inc., to purchase a commercial building at 7 Cedar Grove Lane, Somerset, New Jersey in 1999.  There were three buildings on the property, one of which had been damaged by fire.  Sun Trust Bank committed to lend $2.5 million to finance the acquisition and $1 million for reconstruction of the damaged building.  Lawrence Coven had $900,000.00 on deposit with Euro Bank in the Cayman Islands.  He planned to use that money along with the Sun Trust loan to pay the purchase price.  Just before the closing date, Euro Bank was seized by regulators and its accounts frozen.  Nevertheless, closing occurred in August 1999 with a balance due to the sellers.  It took about a year for the freeze on Euro Bank to be lifted and in the Fall of 2000, Coven transferred the $900,000.00 Euro Bank account to the seller.

## Commerce Bank

In 2000, Lawrence Coven negotiated with Commerce Bank to consolidate all his real estate loans, pay off some credit card debt, and borrow against the equity in his real estate to fund CSLTPC.  The Coven residence had appreciated in value from the $875,000.00 purchase price in 1997 to $1.4 million in 2000.  Commerce Bank agreed to lend $1.12 million, secured by a first mortgage on the Coven residence and $770,000.00 as a commercial loan, secured by first mortgages on the New Providence, Greenbrook, and North Brunswick properties, and a second mortgage on the Coven residence in Warren.

3

The $1.12 million residential mortgage closed first, on August 30, 2000.  For some reason, the mortgage on the residence was never recorded.  Subsequently, on November 16, 2000, the $770,000.00 commercial loan closed.  A mortgage was recorded on the residence and the office condos in Greenbrook.  Again, for some unknown reason, the mortgage was not recorded on the New Providence property.  The evidence suggests, but is unclear,  that the mortgage in favor of Commerce Bank was not recorded on the North Brunswick property as well.

The proceeds of the $770,000.00 commercial loan were supposed to be used to satisfy all mortgages on the collateral, except the $1.12 million first mortgage to Commerce Bank on the Coven residence.  United Trust Bank held a first mortgage on the New Providence property that should have been satisfied.  Instead, two other loans outstanding from Mr. Coven to United Trust Bank were paid and the mortgage loan remained outstanding.

As a result, rather than having two recorded mortgages on the Coven residence and recorded first mortgages on  Greenbrook, North Brunswick, and New Providence, as it expected, Commerce Bank ended up with only one recorded mortgage on the Coven residence, and a first mortgage recorded on Greenbrook.  Commerce Bank held an unrecorded mortgage on New Providence (that was still subject to United Trust Bank's mortgage for $180,000.00) and an unrecorded mortgage on the North Brunswick property.  Its first mortgage on the Coven residence remained unrecorded.

**Guardian Underwriters**

To finance the acquisition and improvement of the commercial building at 7 Cedar Grove Lane, Somerset, NJ through his solely owned entity CSLTPC, Inc., Lawrence Coven managed to borrow $2.5 million from Sun Trust Bank, plus a commitment for an additional $1 million.  Guardian Underwriters acted

as the loan broker in the transaction. Funding of the additional $1 million was delayed for some unexplained reason, but Coven needed money to pay expenses of CSLTPC, Inc. and his law firm. Guardian Underwriters agreed to advance $870,000.00 in anticipation of Sun Trust Bank loaning $1 million in the near future. Coven testified that he believed Guardian's $870,000.00 loan had been wired to his attorney trust account in September 2001, so he disbursed checks from his trust account to his corporation and law firm, and immediately wrote checks from the corporate account to pay creditors of CSLTPC, Inc. and from his attorney business account to pay creditors of his law firm. However, Guardian Underwriter's money had not been wired into the trust account and apparently never was at anytime thereafter.

**Client Funds**

At the same time that Coven was writing checks on his trust account from the non-existent Guardian loan, he was depositing money into his trust account for real estate purchases and refinancing transactions for clients. In each case, Coven had a responsibility to his clients and to their new lenders to disburse money to satisfy mortgages on the client's real estate. In at least three instances that he admitted, Coven failed to payoff the clients' mortgages. These transactions occurred between September and November 2001. The clients will be referred to as Client C, Client D, and Client F. The result was that clients' money, entrusted to Mr. Coven, was diverted to pay expenses of Coven's corporation and his law firm. Furthermore, Coven concealed his wrongdoing by making the monthly payments directly to his clients' lenders, so the clients would not receive default notices, but instead remain deceived.

His trust account was so out of balance that Coven used his attorney business account to close one real estate transaction for a client in December 2001. Again, a mortgage was not timely satisfied. Another law firm found out about this and reported Coven to the ethics authorities at the New Jersey Supreme

Court. Coincidentally, Client C discovered that his loan had not been satisfied when the lender mailed a year-end statement.

## Disbarment

On January 20, 2002, the New Jersey Supreme Court issued ethics charges against Lawrence Coven. After consulting with several prominent attorneys, Mr. Coven decided that his defalcation was indefensible, so he consented to disbarment in March 2002.

Not only did his misdeeds cost Lawrence Coven his law license, they exposed him to criminal liability. Thus, he had an added incentive to payoff the clients' mortgages to lessen his chances of criminal prosecution and mitigate any potential punishment.[1] Since Coven's creditworthiness had been destroyed, he enlisted the cooperation of his mother, who was battling cancer, in extracting equity from his real estate holdings to pay off the clients' mortgages.

## Atlas Title

Following his disbarment, Lawrence sought employment. He took a job as a salesman with Atlas Title, a fledgling title agency started by Troy Ennis. Lawrence passed an examination and received a license from the New Jersey Department of Banking and Insurance to sell title insurance. In addition to his education in real estate law and experience as a practicing attorney, Mr. Coven received additional training from Mr. Ennis regarding title searches and title insurance commitment preparation. Mr. Coven also attended closings and notarized documents for Atlas Title. His employment with Atlas Title gave Mr. Coven opportunities to divert refinancing proceeds, delay recording documents, and discover unrecorded

---

[1]Coven's concern about criminal prosecution lead him to assert his Fifth Amendment privilege against self-incrimination when questioned by the trustee. He later waived his rights and testified fully.

documents that he used to his advantage in the subsequent transactions described hereafter.

**New Providence**

In December 2002, Lawrence and Janet Coven deeded their New Providence property for $1.00 to his mother, Maria Coven. There was no contract of sale. Lawrence arranged for Maria to borrow $265,000.00 from Option One. If the prior $770,000.00 loan with Commerce Bank had been handled correctly, Commerce Bank would have had a first mortgage on the New Providence property to secure the $770,000.00 loan. No other liens would have existed. The mortgage to Commerce Bank had not been recorded, and Mr. Coven had diverted part of the proceeds from the Commerce Bank loan to pay off his other obligations to United Trust Bank, and not his mortgage on the New Providence property. When he deeded the property to his mother, the only mortgage of record was to United Trust Bank for $180,000.00. Coincidentally, Client D's mortgage was with United Trust Bank. Unless Coven knew that Commerce Bank's mortgage had been unrecorded and that United Trust Bank's mortgage remained of record, and that he could, again, divert funds from his mother to pay off Client D's mortgage, it is difficult to see how Coven expected any benefit from transferring and refinancing this property using his mother.

Nevertheless, Maria Coven received title to the New Providence real estate by deed dated December 4, 2002 showing consideration of $1.00. Atlas Title searched the title, prepared a title insurance commitment and handled the loan funds from Option One. Rather than satisfying his mortgage to United Trust Bank, Lawrence diverted the new loan from Option One to pay off Client D's mortgage to United Trust Bank. The result was Maria Coven ended up with title to the New Providence property with a first mortgage remaining to United Trust Bank for $180,000.00 and a second mortgage to Option One for

7

$265,000.00.  Option One was supposed to have a first mortgage, but ended up in second position.[2]

However, Client D's mortgage was satisfied, albeit sixteen months late.

**Warren Residence**

Lawrence and Janet Coven signed a deed dated May 1, 2001 to Maria Coven for their residence

in Warren.  Lawrence testified that the date was a typographical error; it should have been May 1, 2002.

There was no contract of sale.  In any event, the deed remained unrecorded for many months.  In fact,

despite having signed a deed prior thereto, on May 24, 2002, Lawrence and Janet granted a mortgage on

their residence to Client F, who by this time had learned that his mortgage had not been paid off from his

refinancing in September 2001.  Lawrence continued to treat the residence as his own even after signing

a deed to his mother.

By July 2002, following his disbarment, Lawrence began falling behind on his Commerce Bank

loans and was under unrelenting pressure to satisfy mortgages of Clients C, D, and F.  His residence was

his most valuable asset, having increased in value from the purchase price of $875,000.00 in 1997, to $1.4

million in August 2000, when it was appraised for Commerce Bank.  Unless he knew that the $1.12 million

mortgage to Commerce Bank had not been recorded, Lawrence should have assumed that his residence

was burdened by two mortgages to Commerce Bank, for $1.12 million and $770,000.00 - a total of $1.89

million.  Since the liens exceeded the value, a sale or refinance of the residence could not be expected to

yield any excess cash with which to satisfy Clients C, D, or F.  Nevertheless, Lawrence pursued refinancing

using his mother as a pawn.  Lawrence initially thought he could take advantage of his mother's

---

[2]Although the deed to Maria Coven and the mortgage to Option One were dated December 4,
2002, neither was recorded until August 8, 2003.  The reason for this delay was not explained.

creditworthiness by merely adding her name to the deed; however, he learned that any lender would check

the credit of all title holders. Since his and Janet's credit had been destroyed, their names had to come off

the title. Only Maria, who was creditworthy, could appear as the owner and borrower.

Through a loan broker, Lawrence obtained a commitment from First National Bank of Arizona for

a loan to Maria Coven of $1,050,350.00, to be secured by a first mortgage on the Warren residence.

Atlas Title prepared a title commitment showing two mortgages of record: first to Commerce Bank for

$770,000.00, second to Client F for $245,000.00.

Lawrence induced Commerce Bank to issue a payoff statement for its $770,000.00 commercial

loan as well as the arrears on the $1.12 million residential loan. He did not tell Commerce Bank that its

residential mortgage had not been recorded, nor that he planned to transfer title to his mother. He led

Commerce Bank to believe that Maria Coven was refinancing the mortgage on her own residence to give

money to her son to pay off the $770,000.00 commercial loan and bring the $1.12 million residential

mortgage current.

Lawrence failed to inform Troy Ennis, the owner of Atlas Title, that Commerce Bank held an

unrecorded mortgage on his residence. Had Mr. Ennis been informed of the unrecorded mortgage to

Commerce Bank, he would not have been able to assure First National Bank of Arizona a first mortgage

without Commerce Bank's consent.[3]

The deed from Lawrence and Janet Coven to Maria Coven for the Warren residence was

---

[3]Mr. Ennis learned about the unrecorded mortgage at a later time. As soon as he learned this, in light of his knowledge that Mr. Coven had been disbarred for mishandling client funds, Mr. Ennis terminated Mr. Coven's employment with Atlas Title.

recorded on March 20, 2003.  The consideration on the deed was shown as $1.00.  Even though the

residence was worth at least $1.4 million, Maria paid no consideration other than the new mortgage.

Maria signed the loan documents with First National Bank of Arizona on April 25, 2003, and the loan

proceeds were disbursed by Atlas Title on April 30, 2003 (one year before the bankruptcy petition was

filed on April 29, 2004).  The $770,000.00 commercial loan with Commerce Bank was paid in full and

the arrears on the $1.12 million residential loan were cured.  Client F received $117,000.00 and agreed

to subordinate the balance of his mortgage to First National Bank of Arizona.  Excess loan proceeds of

$93,862.27 were disbursed to Maria Coven, thus lowering the notional consideration paid by her for

acquisition of the Warren residence.  The residence was worth between $1.4 and $1.6 million dollars on

the effective date of the transfer, April 30, 2003.  Lawrence received consideration of the $1,050,350.00

loan proceeds from First National Bank of Arizona, less $93,862.27 paid to Maria.  Also Client F's

subordinated mortgage of approximately $150,000.00 still encumbered the residence.  Thus excess value

of between $290,000.00 and $490,000.00 was transferred by Lawrence to Maria.

Since its commercial loan had been paid off, in August 2003 Commerce Bank discharged the

mortgage it held on the New Providence, Greenbrook, and North Brunswick properties, as well as the

second mortgage on the Warren residence.

**Commerce Bank - Further Default**

Mr. Coven defaulted again on the monthly payment on the residential mortgage.  The bank sent

written notice of default and threatened foreclosure.  In preparation for commencing a foreclosure action,

Commerce Bank received a title search on November 4, 2003.  To its chagrin, the bank learned that its

$1.12 million mortgage had not been recorded, that title had been transferred to Maria Coven, and that

Client F and First National Bank of Arizona had recorded mortgages.

**Greenpoint Refinance**

Just about the time Commerce Bank learned that its mortgage had not been recorded, Lawrence Coven arranged for his mother to refinance the mortgage on the Warren residence. Greenpoint Mortgage Finance loaned $1.32 million[4] on November 7, 2003. Atlas Title again handled the proceeds and satisfied the mortgage to Client F and First National Bank of Arizona. Once again, despite title being with his mother, Lawrence treated the residence as his own and extracted equity for his benefit.

**$6,999.26 Transfer**

Lawrence Coven also tried to refinance his commercial building titled in the name of CSLTPC, Inc. The corporation applied for a loan from Western United Life Assurance Co. and paid $10,000.00 as a deposit towards fees with its application. The lender declined to make a loan and refunded $6,999.26 to Coven's attorney. This refund of CSLTPC's money was turned over to Client C in September 2003 on account of the mortgage that remained unsatisfied.

**North Brunswick and Greenbrook**

Also in the Fall of 2003, Lawrence Coven learned that Commerce Bank had released its liens on the North Brunswick and Greenbrook properties. Therefore, he knew that Commerce Bank had no recorded mortgage on any of his property. He arranged for Bayonne Community Bank to loan approximately $500,000.00 to Maria Coven, secured by a mortgage on the North Brunswick and

---

[4]Assuming an 80% loan to value ratio, this suggests the value of the residence had increased to $1.65 million.

Greenbrook properties.   Bayonne Community Bank appraised the North Brunswick property at

$425,000.00 and the Greenbrook property at $250,000.00.   On November 26, 2003 Lawrence and Janet

Coven gave deeds to Maria Coven for the North Brunswick property (showing consideration of

$425,000.00) and for the Greenbrook property (showing consideration of $250,000.00).   There were no

contracts of sale.   Client C's mortgage was paid off as were some other creditors of Lawrence Coven but

nothing was paid to Commerce Bank.   Lawrence himself received $31,541.53 and Client C received

$5,882.69 as reimbursement for mortgage payments and expenses.   A second mortgage of $70,000.00

was placed on the properties in favor of another creditor of Lawrence.

Although the consideration for the transfers was stated as a total of $675,000.00, only the loan

proceeds of approximately $500,000.00 were disbursed, and a second mortgage of $70,000.00 was

placed on the properties.   No documentation was provided to show that Maria Coven paid the balance

of the consideration (approximately $105,000.00).   Nor was any documentation provided to show what

Lawrence Coven did with the $31,541.53 paid to him from the loan proceeds.   Lawrence testified that he

used the money to pay bills and that his parents gave him more than $105,000.00 in consideration by

paying some of his creditors directly.

**Sun Trust Foreclosure**

The Somerset property was a failure.   Sun Trust Bank foreclosed its mortgage and took title to

CSLTPC, Inc.'s only asset - the real property.   Coven and those creditors he induced to lend to CSLTPC,

Inc. were left holding the bag.

**Commerce Bank Suit**

Just as Lawrence Coven was finishing divesting himself of all his real property, Commerce Bank

12

learned that its mortgage on the Warren residence was unrecorded, that title had been transferred to Maria Coven, and that other lenders had recorded mortgages on the property.  The bank summoned Lawrence Coven to two meetings in early December 2003.  Seeming to be cooperative with the bank, Lawrence could offer no payments, but suggested the bank sue the title insurance company and agency that handled the loan closing of the $1.12 million residential mortgage way back in August of 2000.  (It must be remembered that Coven's law firm was the closing agent and the loan proceeds were disbursed through Lawrence Coven's attorney trust account).

When asked by the bank officer why he had transferred his residence to his mother and arranged for a new loan from First National Bank of Arizona when he knew Commerce Bank's residential mortgage was unrecorded, Coven said "I saw an opportunity and I took advantage of it."  Furthermore, when asked if he was considering bankruptcy, Coven said that he had to wait until the preference periods passed.  Note that the satisfaction of the last of the clients whose funds were diverted from Coven's attorney trust account occurred on December 10, 2003.  The ninety-day preference period would have run on March 10, 2004. The deed for the Warren residence to Maria Coven was recorded on March 20, 2003.  The insider preference period is one year.  Lawrence filed bankruptcy on April 29, 2004.

Commerce Bank sued Lawrence Coven as well as the title insurance company and agency in February 2004.

## Maria Coven's Death

Maria Coven lost her battle with cancer on March 21, 2004.  Her will, that had been drawn by Lawrence Coven, was probated on April 7, 2004, and Lawrence qualified as executor.  The sole beneficiary is Lawrence's father, Nathaniel Coven.  Thus by the time he filed bankruptcy, Lawrence had

13

regained legal control of all the real estate he had nominally transferred to his mother.  In addition,

Lawrence, Janet, and their children continued to reside in the Warren residence at all times.  There was no

written lease between Maria and Lawrence permitting occupancy of the Warren residence.  Lawrence

never paid rent directly to his mother, nor to her estate following her death.  Lawrence testified that his

arrangement was to pay the mortgage to First National Bank of Arizona, then later Greenpoint Mortgage,

in lieu of rent.  In fact, Lawrence testified he paid way above market rent for the Warren residence.  A

comparable house in his neighborhood rents for $5,000.00 per month.  The mortgage payments in lieu of

rent ranged from $7,000.00 to more than $9,000.00 per month.  Although Lawrence as Executor opened

a checking account for his mother's estate, not all transactions were processed through that account.

Lawrence testified that he and his father both paid expenses of the estate directly.  Also, his father collected

rent for the New Providence property and did not deposit it in the estate checking account.  Thus, even

with his deceased mother's estate, Lawrence's bookkeeping was unorthodox.

**Fifth Amendment**

Following the bankruptcy filing on April 29, 2004, Lawrence Coven testified at a Rule 2004

examination by First American Title Insurance Company and shortly thereafter at the section 341(a)

meeting of creditors.  On both occasions when asked about dealings with his defrauded Clients C, D, &

F, Lawrence Coven claimed his right under the Fifth Amendment to the U.S. Constitution to refuse to

answer questions that might incriminate him.  Later, during the course of discovery in this adversary

proceeding and at trial, Lawrence was asked again about transactions with Clients C, D & F and he

answered fully.

**Foreclosure of Warren Residence**

14

During trial of this matter, Lawrence Coven, as executor, and Nathaniel Coven, as devisee, were served with a summons and complaint by the current mortgage holder of the Warren residence. Apparently, Lawrence defaulted on his promise to pay the mortgage in lieu of rent.

**Credibility**

Lawrence Coven is a dishonest man.  He admitted receiving substantial funds on behalf of clients and not satisfying mortgages on their real estate.  Instead, he diverted the funds to pay debts of his law firm and corporation.  To conceal his wrongdoing, Coven made monthly payments to the lenders so no default notices would be sent out.  These reprehensible actions resulted in his disbarment as a lawyer and could have landed him in jail.

When Lawrence borrowed $770,000.00 from Commerce Bank, all mortgages to other lenders were to be satisfied so that Commerce would have the first lien.  Rather than pay off the mortgage to United Trust Bank on the New Providence property, Coven diverted funds to pay other loans he had at United Trust Bank.  Furthermore, when he transferred the New Providence property to his mother in December 2002, the proceeds from a new loan with Option One should have paid off the United Trust Bank mortgage.  Again, Coven diverted the proceeds to satisfy Client D's mortgage that happened to be at United Trust Bank as well.

Mr. Coven was questioned about how he could have expected to refinance his residence for $1 million when Commerce Bank was supposed to have two mortgages totaling over $1.8 million.  Mr. Coven testified that in numerous discussions among himself, Louis Chiarlanza of Commerce Bank and Troy Ennis of Atlas Title it was agreed that one loan would be paid off and the other brought current and that Commerce Bank would release both mortgages on the residence.  Mr. Chiarlanza testified and denied any

such agreement. Mr. Ennis testified that he knew nothing about Commerce Bank having two mortgages on the residence. His title search revealed only the $770,000.00 mortgage. Lawrence never told him there was an unrecorded mortgage for $1.12 million.

Mr. Chiarlanza's testimony makes financial sense. He says the bank was looking to get the $770,000.00 commercial loan paid off and the $1.12 million residential loan brought current. That should have left the bank with a first mortgage on the Warren residence worth well in excess of the loan balance. Indeed, Commerce Bank released its liens on the New Providence, North Brunswick and Greenbrook properties, consistent with Mr. Chairlanza's testimony.

Mr. Coven's testimony that the bank agreed to give up two mortgages on the residence if he would payoff the commercial loan and bring the residential loan current, does not make economic sense. The bank would be foolish to give up a lien on Coven's very valuable, saleable residence and be left with liens on three properties. Mr. Chiarlanza, who is no fool, denied making such a deal.        During his testimony, Mr. Coven recollected that he thought the loans were reversed, i.e., that the residential loan would be paid in full and the commercial loan brought current in exchange for releasing all liens on the residence. This theory seems more plausible. The bank might be willing to give up the residence if its residential loan were paid and look to the other three properties to satisfy the smaller commercial loan. There are only two problems with this theory: (1) The new $1 million loan from First National Bank of Arizona would not provide sufficient funds to pay off Commerce Bank's $1.12 million residential loan and bring the commercial loan current; and (2) Coven had already transferred the New Providence property to his mother on December 4, 2002, without telling Commerce Bank. So Coven's alternate rationalization for how he could have pulled off the refinancing of his residence does not hold up under scrutiny.

16

Another explanation given by Mr. Coven does not ring true.  Regarding the New Providence transfer and refinance in December 2002, Coven testified that the title search revealed an open mortgage to United Trust Bank and no mortgage to Commerce Bank.  Coven testified that he told Troy Ennis that United Trust had been paid off.  However, at closing, Atlas Title issued a check for approximately $239,000.00 to United Trust Bank.  If Ennis believed UTB had been satisfied, he would not have cut a check to them.  Coven, of course, took that check to UTB and told them to apply it to Client D's mortgage.

Secondly, Coven testified that when he learned that the Commerce Bank mortgage did not show up as a lien on the New Providence property he "didn't understand why they wouldn't have wanted that as collateral.  But they had taken so many pieces of property I thought there might be some reason they didn't want it." (Trans. Oct. 25, 2005, page 74, liens 22-25.)  Coven's bewilderment is incredible.  At best the discovery of the non-recording of Commerce Bank's mortgage on the New Providence property was another opportunity Coven saw to hinder, delay and defraud Commerce Bank and he took advantage of it.

Another part of his testimony regarding his mother's estate is not true.  On October 21, 2005, a Friday, Mr. Coven testified as plaintiff's witness that he paid the mortgage on his Warren residence in lieu of rent, and that "those rent payments are current through the end of October." (Trans. October 21, 2005 page 96, lines 11-12).  Mr. Coven was recalled to the stand on Wednesday, October 26, 2005.  He revealed that the evening before, a foreclosure complaint was served by the mortgagee on the Warren residence.  He was asked, "[A]re you in arrears or is the estate in arrears on the mortgage on the Winding Ridge Way property?"  He answered, "Yes, probably about three or four months, maybe more." (Trans.

17

October 26, 2005, page 7, lines 3-5).

Coven's dishonesty and lack of credibility infect all of his testimony. His belated attempt to account for the excess value of the North Brunswick and Greenbrook properties ($675,000.00) over the proceeds of the Bayonne Community bank loan ($500,000.00) and the private mortgage ($70,000.00) by claiming his parents paid his creditors over $105,000.00 is not believable. Nor is his story that $31,541.53 disbursed to him was used to pay creditors. The lack of documentation to prove these supposed payments to creditors supports the conclusion that Coven's explanation is an after-the-fact rationalization and not a true reflection of what happened. The truth is that Coven transferred $675,000.00 worth of real estate to his mother and only received $570,000.00 in consideration. The balance of the value was removed from Coven's creditors and remains unaccounted for.

**Maria as Pawn**

None of the transactions between Lawrence and Maria was at arms length. Lawrence controlled all aspects of the transactions including the loan applications for Maria. She never invested any of her own money to purchase these assets, all the proceeds came from new lenders arranged by Lawrence. Disbursement of the closing proceeds were also controlled by Lawrence. He directed funds to Clients C, D, and F, or their lenders, to reduce his chance of going to jail. He continued to live in his residence, had no lease, and promised to pay the mortgage in lieu of rent. Even after transferring the residence to his mother in April 2003, he maintained such control that he engineered a later refinancing with Greenpoint in November 2003 and extracted more money from the property.

I conclude that Lawrence maintained de facto ownership of all properties transferred to his mother. She would have done whatever Lawrence asked of her.

18

It was true, as Lawrence averred, that one of his purposes in using his mother's credit was to repay creditors. But, he was worried only about those clients he had stolen from. His other purpose in transferring title to his mother was to keep his property away from other creditors, particularly Commerce Bank.

The foregoing recitation of the facts exposes a complex web of interrelated transactions. Every transaction has at least one peculiarity - an unrecorded document, delayed recording, incorrect date, misdirected payment, no written contract, nominal consideration, etc. The prevalence of oddities leads me to conclude that they all could not have been caused by innocent mistakes of third parties. Some of these oddities were deliberate acts of Lawrence Coven. He has admitted diverting client funds for his own benefit and on two occasions diverted funds from refinances of the New Providence property to other loans of his or Client D. Whether or not Coven was responsible for the failure to record Commerce Bank's mortgage on his residence, New Providence and North Brunswick, he took advantage of those situations to hinder, delay and defraud Commerce Bank.

## DISCUSSION

Lawrence Coven maintains that his actions were not done for the purpose of defrauding his creditors, he continues to assert his truthfulness, and claims that appropriate consideration was furnished as part of the questioned transactions. Plaintiff seeks to deny the Debtor a discharge under 11 U.S.C. §727(a)(2)(A), (a)(3), (a)(4), and (a)(5). Denial of a discharge contravenes the policy of affording debtors a fresh start; "[i]t is an extreme remedy that should not be taken lightly, and its application should be construed liberally in favor of the debtor." *In re Park*, 272 B.R. 323, 330 (Bankr.D.N.J. 2001), *citing Rosen v. Benzer*, 996 F.2d 1527, 1531 (3d Cir. 1993).

19

**Standard of Proof**

In order to prevail, it is not necessary the Trustee prove the misconduct by clear and convincing

evidence; he need only meet his burden by a preponderance of the evidence.  The United States Supreme

Court, in *Grogan v. Garner*, decided that the preponderance of the evidence standard was proper for

proving exceptions to dischargeability of particular debts under 11 U.S.C. §523(a).  498 U.S. 279, 291,

111 S.Ct. 654, 661, 112 L.Ed.2d 755 (1991) ("[w]e think it unlikely that Congress...would have favored

the interest in giving perpetrators of fraud a fresh start over the interest in protecting victims of fraud.

Requiring the creditor to establish by a preponderance of the evidence that his claim is not dischargeable

reflects a fair balance between these conflicting interests.").  Since that ruling, various circuits have reasoned

the same standard is  appropriate under §727.  *See Farouki v. Emirates Bank Int'l,* 14 F.3d 244, 250

n.17 (4th Cir. 1994); *In re Beaubouef,* 966 F.2d 174, 178 (5th Cir. 1992); *In re Adams*, 31 F.3d 389,

394 (6th Cir. 1994); *In re Lawler*, 141 B.R. 425, 429 (9th Cir. BAP 1992); *In re Serafini*, 938 F.2d

1156, 1157 (10th Cir. 1991) ("we perceive no good reason to apply a different standard where

§727(a)(2) is involved.  It would be incongruous to apply a "preponderance of the evidence" standard to

§523(a) and a "clear and convincing" standard to §727(a)(2).  Such would be clearly at odds with the

rationale in *Grogan*.").  The Third Circuit has also used this lesser standard based on the Supreme Court

ruling in *Grogan*.  *In re Georges*, 138 Fed. Appx. 471 (3d Cir. 2005).[5]  With this standard in mind, the

---

[5]This court is cognizant of a New Jersey District Court case, decided after *Grogan*, that adopts
a clear and convincing evidence standard as the burden of proof under §727(a)(4).  *Scimeca v.
Umanoff*, 169 B.R. 536, 542 (D.N.J.1993).  The cases relied on by the district court pre-date the
Supreme Court's decision in *Grogan*.  *Id.*  Additionally, although *Grogan* was decided in the context
of §523, the Supreme Court recognized a preponderance standard for §727(a)(4): "Congress has
chosen the preponderance standard when it has created substantive cause of action for fraud...Most

court must determine whether the Trustee has met his burden to deny the Debtor a discharge under either §727(a)(2)(A), (a)(3), (a)(4), or (a)(5).

## Section 727(a)(2)(A)

Section 727(a)(2)(A) provides the debtor shall receive a discharge unless "the debtor, with the intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed– property of the debtor, within one year before the date of the filing of the petition." In short, to order to meet his burden under §727(a)(2)(A), the plaintiff must show that in the year prior to filing the petition, the debtor transferred, removed, destroyed, mutilated, or concealed property with the intent to hinder, delay, or defraud a creditor. The intent required is defined in the disjunctive, meaning it is not necessary to show fraudulent intent, rather an intent to hinder or delay is sufficient. *Park*, 272 B.R. at 330. Section 101(54) defines a transfer as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property." In the case before us, the Trustee offers two transactions believed to be transfers or concealment of property done with the requisite intent: (1) transfer of the Warren property and (2) transfer of the Greenbrook and North Brunswick properties.

The facts surrounding the transfer of the Warren property are sufficient to support the denial of

---

notably, Congress chose the preponderance standard to govern determinations under 727(a)(4), which denies a debtor the right to discharge altogether if the debtor has committed a fraud on the bankruptcy court." *Grogan*, 498 U.S. at 288-89, *citing* H.R.Rep. No. 95-595, p.384 (1977), U.S.Code Cong. & Admin.News 1978, pp.5787, 6340 ("The fourth ground for denial of discharge is the commission of a bankruptcy crime, though the standard of proof is preponderance of the evidence"); S.Rep. No. 95-989, p.98 (1978), U.S.Code Cong. & Admin.News 1978, p.5884 (same).

discharge under §727(a)(2)(A).  The Debtor's scheme began when he gave his terminally ill mother, Maria,

a deed to his principal residence.  The deed was signed on May 1, 2002, and was finally recorded on

March 20, 2003.  As part of this transaction, Lawrence arranged for First National Bank of Arizona to loan

Maria Coven $1,050,350.00, which would be secured by a first mortgage on the Warren residence.  The

loan documents were signed by Maria on April 25, 2003, and the proceeds disbursed by Atlas Title on

April 30, 2003 (within one year of the April 29, 2004 bankruptcy filing).  These arrangement were made

by Lawrence despite, or perhaps in light of, his knowledge that Commerce Bank already had a $1.12

million mortgage on the property that was not recorded.  To further hinder, delay and defraud the creditor,

Lawrence induced Commerce Bank to issue a payoff statement under the pretext that Maria Coven was

refinancing her own residence to provide funds for her son to payoff the $770,000.00 commercial loan and

bring the $1.12 million residential mortgage current.  Lawrence made no mention of the fact that Commerce

Bank's residential mortgage was not recorded, nor that he was planning to transfer title to his mother.  Even

after this point, Lawrence continued to maintain so much control that he refinanced the Warren property

with Greenpoint in November 2003, in order to extract more money from the property.

Pinpointing the relevant transaction date is crucial under §727(a)(2)(A) since the code looks back

only as far as one year preceding the bankruptcy filing.  In this case, several of the relevant transaction

dates fall outside the one-year period while one date is within one year of filing.  The bankruptcy filing

occurred on April 29, 2004.  The deed was signed on May 1, 2002, but not recorded until March 20,

2003; and the loan documents were signed on April 25, 2003.  All three of these dates are outside the one-

year look-back period.  However, the loan proceeds were disbursed on April 30, 2003, a date that falls

within one year preceding the filing.  This court believes the date the proceeds were disbursed is the

22

relevant date for determining if there is a transfer within one year. Lawrence testified extensively about this transaction. He believed that the transfer of title to his mother and the loan with First National Bank of Arizona were part of one transaction and that the deed to his mother was not meant to be effective until the loan proceeds had been disbursed according to his instructions. It is clear that the May 1, 2002 date is meaningless. The deed was not recorded then and the Covens gave a mortgage to Client F on May 24, 2002, after the date of the deed. The March 20, 2003 recording date was only for show. Since the loan application was for a refinancing, Maria had to be shown as the record owner. April 25, 2003 was the date the loan documents were signed, but no funds were disbursed. Under the Truth in Lending Act, 15 U.S.C. § 1601 et seq. ("TILA"), a borrower can rescind a transaction for three business days so the transaction is not final until the funds are disbursed. Because the date of distribution makes the transaction final and because Lawrence testified that the transfer to his mother was simultaneous with disbursement of the loan proceeds, the court believes that is the relevant date. Here, that date is April 30, 2003, and it falls within the one-year look-back period.

Alternatively, this court could determine that one of the other three transaction dates is the relevant date and still find a fraudulent transfer under §727(a)(2)(A). Even though each of the other three dates falls outside the one-year period, the doctrine of continuing concealment will work to show the transfer was part of an ongoing scheme to hinder, delay or defraud creditors. Under this doctrine, "a concealment will be found to exist during the year before bankruptcy even if the initial act of concealment took place before this one year period as long as the debtor allowed the property to remain concealed into the crucial year." *Rosen v. Bezner*, 996 F.2d 1527, 1531 (3d Cir.1993). The *Rosen* court identified two elements critical to this doctrine: (1) the debtor has a property right to conceal; and (2) the concealment was motivated by

23

an improper intent.

With regards to the first element, the concealment is only legally relevant if there is a secret interest that the debtor retained in the property. *Rosen*, 996 F.2d at 1532. A secret interest has been described as an express or tacit agreement where the debtor has the right to reconveyance on demand, a right to live rent-free, or the retention of control over the property. *Id*. Despite the transfer of title to Maria Coven, the Debtors remained on the property, exerting complete control and the appearance of ownership. The Third Circuit has already determined that more than mere retention of possession is required under 727(a)(2)(A). *Id*. at 1532 Here, it is apparent that Lawrence's interest goes beyond mere possession. There is little doubt Maria Coven would reconvey the property at Lawrence's request, as he handled all dealings she had regarding the property. As evidence of Lawrence's continuing control he arranged a second refinancing with Greenpoint Mortgage in November 2003 and extracted more money from the property. There was no lease between the parties that evidenced the terms under which the Debtors could remain on the property, nor were any rent payments being made to Maria Coven. Instead, Lawrence explained that he pays the mortgage on the property in lieu of rent. This peculiar rental arrangement occurs despite the fact that he is essentially overpaying the rental value by thousands of dollars each month. Even when Lawrence defaulted in his promise to pay the mortgage in lieu of rent, he was permitted to remain in the residence. Additionally, Lawrence now controls the property as executor of Maria Coven's estate, following her death in March of 2004. As executor of the estate, Lawrence has not sold the property even though the mortgage is in foreclosure and is therefore not serving as a good investment for the estate. The court concludes there was a tacit agreement that Maria would do whatever Lawrence directed regarding the Warren residence, including giving it back to him, refinancing or selling it and giving the proceeds to him.

24

The second element focuses on whether the continuing concealment was done with the intent to hinder, delay, or defraud creditors. *Rosen*, 996 F.2d at 1533. It may be that the debtor made the initial transfer before the one-year period in order to keep his property from creditors. But the relevant question becomes whether, as a result of the transfer, the debtor believed his interest was actually gone, or whether the debtor believed he still retained some secret interest that his creditors may be able to seize if they were aware of its existence. *Id.* Here, Coven had the requisite intent. He knew the Commerce Bank mortgage was not recorded but never informed the bank of this fact. Instead, he allowed Commerce Bank to think Maria Coven was refinancing her own residence in order to allow Lawrence to payoff his commercial loan and come current on the residential loan. Since its commercial loan was paid off from this transaction, Commerce discharged the mortgages it held on the other properties in August 2003, as well as the second mortgage on the Warren residence. When Commerce Bank realized its mortgage was unrecorded, Lawrence wanted Commerce Bank to believe he no longer owned the property. However, Lawrence could have had his mother transfer the property back to him or had her grant a mortgage to Commerce Bank. Therefore, while this court believes the relevant date of the transfer is the date of disbursement, which falls within the one year period, the other dates surrounding the transaction will satisfy the one-year look-back period through the doctrine of continuing concealment.

The transfer of the Greenbrook and North Brunswick properties is likewise subject to skepticism. Bayonne Community Bank appraised the North Brunswick and Greenbrook properties for $425,000.00 and $250,000.00, respectively. Based on these values, Lawrence arranged for the bank to loan Maria Coven approximately $500,000.00, secured by a mortgage on both properties. The deeds to the properties were given to Maria, showing consideration of $425,000.00 and $250,000.00, for a total stated

25

amount of $675,000.00.  The loan proceeds were distributed, part of which paid off Client C and some

other creditors, and $31,541.53 was given directly to Lawrence.  A second mortgage in the amount of

$70,000.00 was placed on the properties in favor of another creditor of Lawrence.  The $500,000.00

disbursement coupled with the $70,000.00 second mortgage falls $105,000.00 short of matching the stated

consideration of $675,000.00.  Without any documentation to support his explanation, Lawrence testified

his parents gave him more than $105,000.00 by paying his creditors directly.  As further evidence of

Lawrence's attempts to conceal property from his creditors, it is worth noting that this transaction occurred

in November 2003, right about the time Commerce learned of its unrecorded mortgage on the Warren

property.

The court concludes that property was transferred with the intent of hindering, delaying, or

defrauding creditors.  A sufficient factual basis exists to support a denial of discharge under §727(a)(2)(A).

**Section 727(a)(3)**

To warrant a denial of discharge under §727(a)(3), the Trustee must show the debtor has

"concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including

books, documents, records, and papers, from which the debtor's financial condition or business

transactions might be ascertained, unless such act or failure to act was justified under all of the

circumstances of the case."  11 U.S.C. §727(a)(3).  Once the objecting party shows an absence of

records, the burden of persuasion is on the debtor "since the information necessary to establish an excuse

for inadequate or non-existent records is generally in the possession of the debtor."  *Meridian Bank v.*

*Alten*, 958 F.2d 1226, 1233 (3d Cir. 1992).

The Trustee alleges the Debtor failed to keep and preserve records with regards to funds deposited

26

in Euro Bank, an offshore bank in the Cayman Islands. Lawrence testified to depositing approximately

$900,000.00 in the account. When asked to explain the whereabouts of those funds, Lawrence testified

that the money was used to purchase commercial real estate in 1999. Lawrence was unable to produce

the records to verify this transaction. The Trustee believes this failure to produce is sufficient to deny a

discharge under §727(a)(3). The Trustee has met his initial burden by showing the requested records were

not produced. Accordingly, the Debtor then must show a justification, although the ultimate burden of

proof remains on the Trustee. Here, the court chooses to accept the explanation provided by Mr. Coven

as a valid justification. Mr. Coven testified the records were destroyed when his office was flooded. The

Debtor cannot be held accountable for an act beyond his control. *In re Martin*, 554 F.2d 55, 57-8 (2d

Cir.1997). Because Lawrence has proven that his office did in fact flood, and because the 1999

transaction is somewhat remote in time from the bankruptcy filing, the court is satisfied that the failure to

preserve was justified. Therefore, a denial of discharge under §727(a)(3) is not appropriate.

**Section 727(a)(4)**

Under §727(a)(4), a debtor will be denied a discharge if "the debtor knowingly and fraudulently,

in or in connection with the case– (A) made a false oath or account; (B) presented or used a false claim;

(C) gave, offered, received, or attempted to obtain money, property, or advantage, or a promise of money,

property, or advantage, for acting or forbearing to act; or (D) withheld from an officer of the estate entitled

to possession under this title, any recorded information, including books, documents, records, and papers,

relating to the debtor's property or financial affairs." Essentially, this section "imposes affirmative duties

upon a debtor to disclose the existence of all assets and his ownership interests in property and to answer

all questions fully and honestly for the benefit of his creditors and other parties with an interest in the proper

27

administration of the bankruptcy case who are entitled to a 'truthful statement' of the debtor's financial condition." *In re Henderson*, 134 B.R. 147, 159 (Bankr.E.D.Pa. 1991), *citing In re Arcuri*, 116 B.R. 873, 879-80 (Bankr.S.D.N.Y. 1990). An objection to discharge under this section requires the plaintiff prove two elements: (1) the debtor knowingly and fraudulently made a false oath, that (2) related to a material fact. *In re Kisberg*, 150 B.R. 354, 356 (Bankr.M.D.Pa. 1992). This includes making a false statement or omission as part of the Statement of Financial Affairs. *Scimeca v. Umanoff*, 169 B.R. 536, 542 (D.N.J. 1993).

The Trustee asserts denial of discharge is appropriate under §727(a)(4) because of an omission in paragraph 10 of the Statement of Affairs in the Debtor's bankruptcy petition. Paragraph 10, entitled "Other transfers," requires the debtor "[l]ist all other property, other than property transferred in the ordinary course of business or financial affairs of the debtor, transferred either absolutely or as security within one year immediately preceding the commencement of this case." On August 15, 2003, Western United Life Assurance Company refunded $6,999.26 from a failed commercial lending transaction with Mr. Coven's corporation. On September 16, 2003, Mr. Coven released those funds to Client C. Later on December 3, 2003 Client C's mortgage was paid from proceeds of the Greenbrook and North Brunswick properties transferred to Maria. Also, Client C was paid $4,882.69.

The Trustee believes these transactions between Mr. Coven and Client C should have been included in response to paragraph 10. The court disagrees. Paragraph 3 of the Statement of Financial Affairs is entitled "Payments to creditors." Section (a) of that paragraph instructs the debtor to "[l]ist all payments on loans, installment purchases of goods or services, and other debts aggregating more than $600 to any creditor, made within 90 days immediately preceding the commencement of this case." Paragraph

28

3(b) requires the debtor "[l]ist all payments made within one year immediately preceding the commencement of this case to or for the benefit of creditors who were insiders." In a separate adversary proceeding the court determined that Client C was not an insider of Mr. Coven. Therefore, these transfers to and for the benefit of Client C did not have to be disclosed in response to question 3(b) since Client C was not an insider; nor did they have to be disclosed in response to question 3(a) since they were more than 90 days prior to the petition.

Question 3 is specific and deals with payments to creditors. Question 10 is general and deals with other transfers. The specific should control over the general. Because these transactions did not have to be disclosed as a payment to a creditor under paragraph 3, it was not necessary to disclose them as transfers under paragraph 10. The Trustee's proof has not established a cause of action under §727(a)(4).

**Section 727(a)(5)**

Under §727(a)(5) denial of discharge is appropriate if the debtor "has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities." To meet his burden, the plaintiff "'must introduce more than merely an allegation that the debtor has failed to explain losses, e.g., the objector must produce some evidence of the disappearance of substantial assets or of an unusual transaction which disposed of assets.'" *Park*, 272 B.R. at 332, *quoting In re Ishkhanian*, 210 B.R. 944, 953 (Bankr.E.D.Pa.1997). The plaintiff is not required to show the debtor acted fraudulently or intentionally. *Id.* Here, the Trustee has shown both the disappearance of substantial assets and unusual transactions that disposed of these assets. In the transfer of the North Brunswick and Greenbrook properties from Lawrence and Janet Coven to Maria Coven, the stated consideration was $675,000.00. While Maria Coven was given the deeds to both

29

properties showing values of $425,000.00 and $250,000.00, respectively, there is no evidence that Lawrence and Janet Coven received the stated consideration in exchange. Bayonne Community Bank provided $500,000.00 for the property, most of which paid Lawrence's creditors, while Lawrence himself received $31,541.53. Additionally, a second mortgage of $70,000.00 was placed on the property in favor of another creditor of Lawrence. That leaves approximately $105,000.00 of consideration for which there has been no account. Lawrence submits that his parents gave him more than $105,000.00 in consideration by paying some of his creditors directly, but no documentation was provided to corroborate this testimony. Considering Lawrence's lack of credibility the court does not accept his testimony. The value of the property transferred compared to the amount of money disbursed in exchange has not be reconciled. Additionally, Lawrence has never explained what he did with the $31,541.53 paid directly to him from the loan proceeds. Because Mr. Coven has failed to satisfactorily explain this loss of assets in this unusual transaction, the Trustee has met his ultimate burden of proof under §727(a)(5). No explanation has been given for the transfer of excess value of the Warren residence to Maria Coven over the notional consideration. By the court's calculation explained above, between $290,000 and $490,000 of excess value was transferred to Maria Coven. Lawrence has failed to satisfactorily explain that loss of assets, warranting denial of discharge under §727(a)(5).

**Section 727(a)(6)[6]**

The Trustee also asserts that the Debtor's refusal to answer questions about Clients C, D & F provides grounds for denying discharge. The Trustee is mistaken in this respect. Section 727(a)(6)(B)

---

[6] The trustee did not cite subsection 727(a)(6) in his complaint.

states a debtor will not be granted a discharge if "the debtor has refused, in the case– on the ground of privilege against self-incrimination, to respond to a material question approved by the court or to testify, after the debtor has been granted immunity with respect to the matter concerning which such privilege was invoked." Under this section, a debtor can be refused a discharge for failure to testify if granted immunity. Immunity would protect the privilege against self-incrimination, and refusal to testify would be unwarranted. Here, the Debtor invoked his Fifth Amendment privilege but no such immunity was provided to the Debtor. Additionally, although Mr. Coven originally invoked his Fifth Amendment right, he testified fully at subsequent discovery and trial.

### CONCLUSION

The Trustee seeks a judgment denying the Debtor, Lawrence Coven, a discharge under 11 U.S.C. § 727(a)(2), (a)(3), (a)(4) and (a)(5). With respect to § 727(a)(3), the court holds that the lack of records for the account at Euro Bank was justified by their destruction in a flood. Therefore, judgment will be entered for the Debtor finding no cause to deny him a discharge under section 727(a)(3).

The court holds that failure to list the three transfers to, or for the benefit of, Client C between September and December 2003 in response to question 10 of the Statement of Financial Affairs does not constitute a false oath under §727(a)(4). Questions 3(a) and 3(b) seek information about transfers to creditors within 90 days prior to bankruptcy or within one year for insiders. None of the payments to, or for the benefit of, Client C need have been listed in response to question 3(a) since they occurred more than 90 days prior to the petition. Nor need they have been listed in response to question 3(b) since Client C was not an insider. Question 3 is specific as to payments to creditors, while question 10 refers to other transfers. If a transfer to a creditor does not have to be listed in question 3, it does not have to be listed

31

in question 10 either.  The court will grant judgment to the Debtor finding no cause to deny him a discharge under §727(a)(4).

The transfers of the Greenbrook and North Bergen properties to Maria Coven on December 4, 2003, within one year of the filing of the petition on April 29, 2004, were done with the intent to hinder, delay or defraud Commerce Bank.  Denial of a discharge under §727(a)(2)(A) is warranted.  In addition, the Debtor has failed to explain satisfactorily the loss of the difference between the value of the two properties ($675,000) and the consideration he received ($500,000 in new funds from Bayonne Community Bank plus the $70,000 second mortgage to a creditor).  The Debtor's vague, unsubstantiated explanation that his parents paid more than $105,000 to his creditors around the same time as the transfers is not a satisfactory explanation.  Judgment will be entered denying a discharge under §727(a)(5).

With regard to the Warren residence, the transfer to Maria Coven on April 30, 2003, within one year of the filing of the petition on April 29, 2004, was done with the intent to hinder, delay or defraud Commerce Bank.  Even if the date of the transfer were more than one year before bankruptcy, the Debtor concealed the interest he maintained - the tacit agreement of his mother to do whatever Lawrence requested with the property including: (a) allowing him and his family to reside there whether they paid rent or not, (b) refinancing the mortgage and giving the excess proceeds to Lawrence, ( c) selling the property and giving Lawrence the proceeds or (d) reconveying the property to him.  Either the transfer within one year, or the continuing concealment of Lawrence's interest, with the intent to hinder, delay or defraud Commerce Bank warrant denial of a discharge under §727 (a)(2)(A).

Lastly, the Debtor has failed to explain satisfactorily the loss of the difference between the value of the residence on the date of the transfer ($1.4 to $1.6 million) and the consideration he received

32

($1,050,350 less $93,862.27 paid to Maria plus the approximately $150,000 subordinated  mortgage to

Client F).  Judgment will be entered denying the Debtor a discharge under §727(a)(5).


Dated: November 17, 2005                          __/S/ *Raymond T. Lyons*_____
                                                  Raymond T. Lyons, U.S.B.J.